No. 1834.

Second Circuit Appeal.

---

ELSTON MALEBY v. GULF REFINING CO. of LA.

---

(November 6, 1924, Opinion and Decree on Rehearing)

(January 12, 1925, Rehearing Denied)

---

(*Syllabus by the Editor.*)

1. **Louisiana Digest—Master and Servant —Par. 160 (j).**
Where employee's skull was injured causing fits which ceased after an operation was performed, plaintiff has not proven permanent total disability to recover compensation under Employ-

ers' Liability Act No. 20 of 1914 Section 8, Subsec. 1 (b).

2. **Louisiana Digest—Master and Servant —Par. 160 (e).**

Where there is a judgment rejecting plaintiff's demands, the appellate court may remand the case for further evidence on the question of ability of plaintiff to perform work of a reasonable character if it believes this necessary to further the ends of justice. Section 20 of Act No. 20 of 1914, the Employers' Liability Act, making it possible to take more evidence after one year has no application to this case because there was no judgment granting compensation.

(Opinion after remand, reversing former opinion):

3. **Louisiana Digest—Master and Servan —Par. 159 (a).**

The fact that a man forces himself to do work is not the test of disability after an accident where his working shortens his life out of all proportion. In this case a fracture of the skull caused a condition evidenced by an abnormally high blood pressure and other symptoms which enables the employee to recover under Section 8, Subsec. 1 (b), of Employers' Liability Act No. 20 of 1914, for permanent total disability.

Appeal from the First District Court, Parish of Caddo, Hon. T. F. Bell, Judge.

This is a suit ·under the Employers' Liability Act No. 20 of 1914 by an employee for compensation.

Judgment for defendant and plaintiff appealed.

Judgment affirmed.

On a rehearing, judgment reversed.

Huey P. Long and Philip H. Mecom of Shreveport, attorneys for plaintiff and appellant.

J. S. Atkinson and F. E. Greer of Shreveport, attorneys for defendent and appellee.

PORTER. J.  This is a suit under the Workmen's Compensation Act, in which the plaintiff claims compensation at the rate of $18.00 per week for 400 weeks, less twelve weekly payments which he has received from the defendant Company, for certain physical injuries which he received while engaged in working for said Company.

The lower Court rejected plaintiff's demands, and he has· appealed.

The sole question presented is one of fact, that ·is to say, whether the disability from which plaintiff claims to be suffering is traceable to the accident of which he was admittedly the victim. He was working as a "roustabout" around an oil well belonging to the Company, when a rod hook fell and struck him upon the top of his head. He alleges, in his petition, that the blow fractured his skull, and otherwise inflicted serious damage on, in, and about his head, and his nervous and physical system in general.

He testified that about four months after the accident, he began to have epileptic fits, that he would shake all over, froth at the mouth, and become unconscious. He says he began to have these fits about four months after the accident, and that he continued to work until he had the fits.

Defendant's time keeper testifies that plaintiff lost only two days after the accident. He says it occurred on July 10th, 1921. (The petition alleges June 10th as the date of the accident.)

The records showing plaintiff's time, which are undisputed, show that from, say three days after the accident, he put in practically full time; seven days a week of ten hours—until and including the middle of February, 1922, or seven months. And

he is credited with two days in March, and eleven in May.

In the latter part of February, plaintiff was sent by the defendant Company to the Highland Sanitarium for examination and treatment. An X-ray picture was made of his skull by Dr. Rutledge, a specialist in radiology, which failed to disclose any fracture, or anything which could account for the fits or other symptoms of which plaintiff complained.

Dr. Hendricks, Chief Surgeon of the above institution, thought that, perhaps, there might be some adhesion which the X-ray would not show, and decided upon an operation. He lifted a portion of the bone of the skull where the blow had been received, and found no adhesion, and is quite positive that there is no injury to the skull or brain.

Just before the trial, counsel for the Company asked the Court, by motion filed in the record, to appoint three disinterested physicians to examine into the plaintiff's condition, for the purpose of determining whether plaintiff is subject to epileptic fits, or other disorders, due to the accident which he received. The Court appointed Dr. J. C. Willis, a leading physician and surgeon of Shreveport, and he reported the result of his examination as follows:

"Hon. T. F. Bell, Judge,
Caddo Parish District Court,
Shreveport, La.

Dear Sir:

On examination of Mr. E. B. Maleby, at your request, we find that following an injury to his head which he sustained some time ago and an operation on same for the purpose of relieving the pain and pronounced nervous symptoms (fits) which were supposed to have been caused by the injury, he has been relieved to the extent that the so-called fits have discontinued, but that he still complains of nervousness and extreme sensitiveness of the scalp, the condition being technically known as hyperthesia. This seems to exist to such an extent that brushing or even handling the hair causes marked discomfort, and some pain. This condition, we do not consider serious ordinarily, but we recognize the fact that it is very annoying.

I also find that he has a blood pressure (taken on two occasions three days apart) of 155 systolic, and 100 to 105 diastolic. The normal pressure in a man of his age should be 120 systolic and 90 diastolic. Evidently, he has a hypertension from some cause for which I am unable to account, unless it is in some way connected with the accident. This condition, if permament, we consider serious. However, this patient presents the appearance of being a neurotic, or in other words, he shows evidence of being of an unstable nervous type.

Whether these conditions existed previous to the injury, or whether they were entirely caused by the injury, I am unable to say, as I am not familiar with either his past history or condition. However, I am unable to connect them with any present general systemic condition, for his vital organs, such as heart, kidneys and lungs, are in good condition, and his blood examination (Wasserman) shows negative, and with the exceptions noted above, his general condition is good.

Respectfully submitted,

JCW-B      J. C. Willis, M. D."

Dr. Willis was called as a witness by the plaintiff. The trend of his testimony is along the lines of his report to the Judge. It bears the impress of absolute frankness and impartiality. He evidently realized that he was an advisor of the Court on matters which experts alone are competent to testify. It is not necessary to discuss his testimony, or that of any of the other physicians who testified in the case.

The sum of it is, that it is not possible, without further knowledge of the facts of the case, including the physical history of plaintiff's antecedents, to state with any de-

gree of certainty, that the condition of plaintiff is attributable to the accident. It is possible that it is and possible that it is not.

He states that plaintiff's high blood pressure may be the result of several causes—hardening of the arteries, and toxemia, among them—one of the causes of the latter being, as we understand, faulty elimination. He was asked if he found anything that might produce the present condition of the plaintiff which existed before the accident, and answered: "No, not that I could positively state."

Dr. G. H. Cassity testified for the plaintiff, and his testimony is distinctly favorable to him.

The trouble about it is the general tenor of his testimony is opposed to that of the other three physicians who testified, including Dr. Willis, and that it appears to be based upon the assumption that plaintiff's skull was fractured, or that there were adhesions between the bone and the brain, when the only persons who were competent to give evidence as to the condition of the skull swear positively that no such conditions exist. We refer to Dr. Hendricks, who operated on plaintiff; and to Dr. Rutledge, the radiologist. The latter says: "On lifting the osteopathic flap and examining the inner plate of the skull, it showed absolutely no injury. The dura was perfectly normal, and no adhesions." He says he found nothing in his examination that would cause epilepsy. He says that intestinal toxemia, or focal infection are common causes of epilepsy.

Plaintiff admits that the fits ceased after the operation. He said at the time of the trial that his head was sore; that he could not stand to get hot; that when he got hot, it hurt him all over; that he could not do any work. It is somewhat significant that

the statement as to having fits depends solely upon his own testimony. It is not corroborated by any other witness.

It is impossible from the testimony in the record for any court to say with any reasonable degree of certainty that the condition of which plaintiff complains is due to the accident.

The rule that plaintiff must establish his case applies to this class of cases, as well as to others. See Haddad vs. Truck Co., 150 La. 327, 90 South. 666, and authorities there cited.

The judgment appealed from is affirmed.

––––––

ON APPLICATION TO REMAND

PORTER, J. In this case, the District Court rejected plaintiff's demands. On appeal, this Court affirmed that judgment. An application for a rehearing was granted, and the case is pending on that order. The contention of the plaintiff is that as a result of an accident—the falling of a piece of iron upon his head—his skull was fractured, and that he was totally permanently disabled to do any work of a reasonable character, and he prayed for compensation at the rate of $18.00 per week for four hundred weeks.

The contention of the defendant Company was that plaintiff had recovered from the effects of the accident, and that the illness from which he complained, and which occurred several months after the accident, had no connection with it.

The rehearing was granted in June, 1923.

In the brief in support of the application, plaintiff's counsel says:

"We have seen this poor plaintiff, destitute and helpless, making every effort possible to secure some kind of employment which would require no kind of exertion. His utter physical capacity is not disputed."

Since the order granting a rehearing was issued, the defendant Company has filed in this Court a motion to remand the case for the purpose of taking additional testimony on the question of plaintiff's ability to do work of a reasonable character.

The motion, which is duly verified, alleges that the facts upon· which it is based have come to the knowledge of defendant since the rehearing was granted, and there is attached to the motion an affidavit by one J. Curtis Parker, which is to the following effect:

That he is employed by the Woodley Petroleum Company, as time keeper; that he has knowledge of the duties and character of employment of all of the employees of said Copany, and of the wages or salaries paid them; that he knows E. Maleby has been in the employment of said Company since the 17th day of July, 1923, as pusher of a roustabout gang in the Arkansas oil fields, during which time he has been˜ paid a salary of $180.00 per month, which is in excess of the wages generally paid roustabouts by other Companies, and that during said time of employment, no amount has been deducted from the monthly salary of said Maleby on account of loss of time from illness or other physical incapacity.

One of the allegations of the motion is that from information received from reliable persons, the plaintiff began work in the Arkansas oil fields soon after the trial of this case in the District Court, and has been working· there regularly ever since, at wages equal to or in excess of the wages he received from the defendant at the time he was injured.

We think that, under the showing made, the case ought to be remanded in justice to both parties—the plaintiff and the defendant.

It is therefore ordered and decreed that this case be, and it is hereby, remanded to the Honorable the First Judicial District Court, for the Parish of Caddo, Louisiana, with directions to re-open the note of evidence for the taking of such legal testimony on the question of plaintiff's ability to perform work of a reasonable character, since the trial of the cause in said Court, as both parties shall desire to offer, after which the entire record will be returned to this Court.

## ON MOTION TO SET ASIDE ORDER REMANDING THE CASE TO THE DISTRICT COURT.

The motion is denied. This Court will, however, on its own motion, recast its order as follows:

It is ordered that the former judgment of this Court, affirming the judgment of granting ·a rehearing in the case, be, and they are hereby set aside.

It is now ordered and decreed that this case be, and it is hereby remanded to the District Court of the First Judicial District, in and for the Parish of Caddo, with instructions to re-open the note of evidence for the reception of legal evidence work of reasonable character, as counsel for both parties shall see fit to offer, and that the case there be further proceeded with according to law.

The Court will hereafter · file written reasons for denying the motion to set aside its order remanding the case.

## ON APPLICATION TO SET ASIDE MOTION TO REMAND.

After considering the arguments and briefs of counsel for ·both parties on the motion to set aside our order remanding

the case to the lower Court for the purpose therein stated, we are convinced that we pursued the proper course in granting said order.

The District Court, after hearing the evidence in the case, rejected plaintiff's demand. This Court, in an opinion handed down on June 2nd, 1923, affirmed that judgment. It subsequently granted, on the application of plaintiff's counsel, a rehearing. Defendant's counsel then filed a motion to remand the case to the District Court for the purpose of taking additional testimony on the question of plaintiff's abil ity to do work of a reasonable character and, attached to the motion, is an affidavit which purports to be signed by J. Curtis Parker, time keeper of the Woodley Petroleum Company, to the effect that the plain tiff has been in the employ of said Company since the 17th of July, 1923, (the affidavit is dated Nov, 13, 1923) as a pusher of a roustabout gang in the Arkansas oil fields, during which time he has been paid a salary of $180.00 per month. (The same wages that plaintiff was earning at the time of the injury.)

This Court thereupon issued its order, remanding the case to the lower Court for the purpose above stated.

Subsequently, plaintiff's counsel filed a motion to set aside the remanding order, upon two grounds, viz: (1) That the Court was without authority to issue said order and cited in support of that contention the case of Deniels vs. Shreveport Producing & Refining Co., 151 La. 800, 92 South 341; (2) That he had never been notified of the application to remand by defendant's counsel or the affidavit aforesaid, and he annexed to his motion an affidavit of J. R. Porten, Secretary & Treasurer of the Woodley Petroleum Co., to the effect that the plaintiff had been employed by said Company, "for a short time", but after reasonable trial, was found unable to do the work to which he was assigned with proper efficiency, and was therefore discharged.

1. The position taken by plaintiff's counsel that we were without legal right to remand the case is grounded upon the decision by the Supreme Court in the case of Daniels vs. Refining Co., above referred to. In our opinion, that decision has no application to the question here presented, for these reasons: In that case, the plaintiff had recovered a judgment in the District Court awarding him compensation for certain injuries, and the defendant Company appealed. Pending the appeal, the defendant filed a motion, supported by affidavit, to have the case remanded "for the purpose of showing that plaintiff's wage earning capacity had increased since the trial". The Court denied the motion on the ground that about eleven months had elapsed since the judgment of the lower Court was rendered, and that defendant would, within another month, have the right, under the Compensation law, to a revision on the judgment. And it found that the record was such as to enable it to render a final judgment in the case. We do not feel, for the reasons not necessary to mention, that we could, consciously, render a final judgment in this case.

But more than this; the opinion under discussion was based upon Section 20 of the Compensation Act, and that Section provides, in substance, "that a judgment of compensation may be modified", by agreement between the parties, with the approval of the Court, or "said judgment of Compensation" may be reviewed on the application of either party, within a year after its rendition, and that the amount of compensation allowed may be increased or decreased, according as the facts warrant.

There is no "judgment of Compensation" in this case. On the contrary, the District Court rejected plaintiff's demand entirely, and, hence, there is no judgment to be reviewed in accordance with the section referred to.

We note, in passing, however, that the Supreme Court in two cases—Bourgeois vs. Construction Co., 149 La. 669, 90 South. 17 and Pye vs. Electric Co., 147 La. 537, 85 South 232, did just what we have done in this case, except that in both of those cases the plaintiffs had recovered judgments in the District Court.

2. The second contention of plaintiff's counsel need not be discussed, because even if there was error in our first order, for the reason that counsel was not notified, that error has been cured by the opportunity given counsel to argue the motion, both orally and by briefs, of which opportunity he has fully availed himself.

The motion to set aside our motion remanding the case is therefore denied. See decree:

## OPINION ON REHEARING AFTER REMAND

CROW, J. On first hearing of this case by this court the judgment of the District Court, rejecting plaintiff's demands was affirmed. An application for a rehearing was filed by plaintiff and later a rehearing was granted. After the order granting the rehearing had been made by this court counsel for defendant filed here a motion setting up that, in the event the judgment of the District Court, on rehearing, should not be affirmed, then the case should be remanded to the lower court to enable defendant to supply evidence to show that plaintiff's condition was normal and that he had fully recovered from the injury he had received and the effect of the consequent operation performed on his skull by Dr.

Hendricks, as described in our former opinion herein.

After due consideration of the said motion to remand, this court, in the following order or decree, remanded the case to the District Court:

"It is, therefore, ordered and decreeded that this case be and it is hereby remanded to the Honorable The First Judicial District Court for the Parish of Caddo, Louisiana, with directions to re-open the note of evidence for the taking of such legal testimony on the question of plaintiff's ability to perform work of reasonable character, since the trial of the cause in said court as both parties shall desire to offer, after which the entire record will be returned to this court."

In compliance with and conformity to the foregoing order, the case was again taken up in the District Court on April 1, 1924, and evidence was submitted by both parties. After the case was again submitted to the said District Court, his Honor, Judge T. F Bell, in a written opinion handed down by him, said:

"This is a compensation case. When first tried in this Court, judgment was rendered rejecting the demands of plaintiff. We did this on the ground that there was not sufficient evidence in the record to connect the injury of plaintiff with his condition at the time of the trial. We never had any doubt of plaintiff's condition; that it was such as to prevent him from doing reasonable work. The case was presented to the Court of Appeal when the judgment of the lower court was affirmed. A rehearing was granted and later the case remanded to take evidence on the restricted question of plaintiff's ability to work. This evidence has been taken, and it devolves upon us to again render judgment. This evidence shows that plaintiff, since the time the first judgment was rendered has done considerable work, but our opinion as to his present condition is no different from what it was after the first trial, and that is, although he has worked, he is in no physical condition to work, and should not work. He has worked during that time because he

had to in order to live, but we are of the opinion that every day he does work shortens his chance of life out of all proportion.

Since this judgment was first rendered the Supreme Court has rendered opinions in cases which cannot be reconciled, in our opinion, with our judgment in this case. But the Constitution of 1921 has passed jurisdiction on this class of cases in the Court of Appeals, and we do not know what view that Court will take in a case, such as this, where no other reasonable cause of plaintiff's condition can be given except the accident which befell him.

If the case were being presented to us as a new case we would be inclined to follow what seems to us to be the present jurisprudence of the Sureme Court, and find for plaintiff, but in view of the condition of this case, we thing it the better policy to reinstate our former judgment, and let the case again go to the Court of Appeals, and let that Court formulate its own policy for the future guidance of this Court.

For the foregoing reasons there should be judgment rejecting the demands of plaintiff and it is so ordered.

T. F. Bell,
District Judge"

The said learned and able Judge frankly says: "We never had any doubt of plaintiff's condition; that it was such as to prevent him from doing reasonable work". He also says: "Since this judgment was first rendered the Supreme Court has rendered opinions in cases which cannot be reconciled, in our opinion with our judgment in this case. But the Constitution of 1921 has vested jurisdiction over this class of cases in the Court of Appeals, and we do not know what view that Court will take in a case, such as this, where no other reasonable cause of plaintiff's condition can be given except the accident which befell him". He further states: "If this case were being presented to us as a new case we would be inclined to follow what seems to us to be the present jurisprudence of the Supreme Court, and find for plaintiff; but

in view of the condition of this case, we think it the better policy to reinstate our former judgment, and let the case again go to the Court of Appeals, and let that Court formulate its own policy for the future guidance of this District Court." He accordingly, again rejected the demands of plaintiff.

The record has been again sent to this Court in accordance with our order remanding the case to the District Court, and is before us for final determination of the issues involved therein.

At the time the case was last argued in this court. Counsel for defendant, appellee, filed another motion to have the case again remanded, in the event we should not affirm the judgment of the lower court. The motion sets up, substantially, the same sort of alleged facts as did the first motion to remand, which was sustained by this court, viz: That defendant had learned that plaintiff had been doing work of a reasonable character since the last trial and that he did not quit work until about five days before the last trial. The motion is based mainly on hearsay statements and ex parte letters and affidavits. Since the case was submitted the last time to this court, plaintiff has filed counter affidavtis of himself and his brother-in-law, Mac Spoon, with whom plaintiff had worked, or attempted to work, in which it is said "that in attempting to do hard work, or any kind of work he (plaintiff) has undergone such continuous and serious pain and suffering that he has constantly endangered his life, and finally on last Wednesday (preceding November 1st, 1924) he (plaintiff) hardly escaped dying as a result of such exertion; that he (plaintiff) has been advised by his physician that he cannot work or labor; that he cannot comb his head and at present his condition is such that he cannot even wear a hat on his head; that affiant (plaintiff) cannot now do any work

without serious probability of dying. This he (plaintiff) knows not only of his own experience, but from medical advice he has been given".

While we think the motion of defendant, appellee, to again remand this case is made in good faith, we also think that it is based on the fact that plaintiff had worked or tried to work, some since the last trial, and before that time, when, as said by the trial judge, "he is in no physical condition to work, and should not work. He has worked during that time because he had to in order to live, but we are of the opinion that every day he does work he shortens his chance of life out of all proportion." It is his ability to perform services of a reasonable character that is made the test and not the fact that, out of sympathy of his employer or his fellow workmen, he does some work. Nor is the fact that he forces himself to do some work, out of dire necessity, made the test in compensation cases, particularly when to do so "shortens his life out of all proportion." (See Hulo vs. City of New Iberia, 153 La. 284, 95 South. 719; Norwood vs. Lake Bisteneau Oil Co., 145 La. 823, 83 South. 25.

Too, there must be an end to a case of this character sometime. This is certainly true when, under the law, judgments in compensation cases may on application of either party be modified by the court after one year from the dates they become operative. If we should order the case again remanded on the showing made by defendant, appellee, the same sort of application as made by defendant might again be made when the record would again come up to this court, and then again and again, and so on *ad infinitum.*

In the meantime, in all probability, the plaintiff would have "shuffled off this mortal coil" and passed into another realm.

The motion to again remand the case, therefore is denied.

### ON THE MERITS.

The reason, apparently, why the District Judge did not render judgment for plaintiff on first hearing, and the reason why this court affirmed said judgment, was as said by the District Judge, because "we did this on the ground that there was not sufficient evidence in the record to connect the injury of plaintiff with his condition at the time of the trial; "or, in other words, that the accident of which plaintiff complains, was not shown to be the cause of plaintiff's condition.

On a reconsideration of the case and a careful and painstaking study of all the facts and circumstances as disclosed by the record, we are of the opinion that the evidence does preponderate in favor of plaintiff's condition and does warrant a judgment in his favor. It is patent from a mere cursory reading of the written opinion of the District Judge on last hearing that he, too, believes that, under the present jurisprudence of the Supreme Court of this State, plaintiff is entitled to recover judgment. However, he says he prefers that his former judgment stand and that the case be again sent to this court, in order that, as he says, this "Court formulate its own policy for the future guidance of this (District) Court." Of course, this Court will follow and be guided by the decisions of the Supreme Court, in so far as those decisions are applicable to the cases under consideration by this Court.

The evidence discloses that plaintiff was a well and healthy man of approximately twenty three or four years of age, when while engaged in work as a "roustabout" for the defendent company in its operations for gas and oil, a rod hook of steel or iron weighing several pounds fell a distance

of from fifteen to thirty feet and struck him on the head; that he was hurt thereby and became sick and lost two or three days from his work immediately; that, within a few weeks or months, he developed epileptic fits, so he swears, and in that he is not contradicted but corroborated by certain facts and circumstances hereinafter adverted to; that he was sent or directed to the sanitarium in Shreveport by defendants's officers or agents, where he related his condition to Dr. Hendricks, who told him to wait a few weeks and if the fits recurred to return to him and he would operate on his head; that within a few weeks thereafter, plaintiff did return to Dr. Hendricks, at the sanitarium, and told him the fits had recurred and that he was willing to have the operation performed as previously suggested by Dr. Hendricks; that Dr. Hendricks performed an operation on plaintiff's skull by removing a portion thereof in the exact place of the wound caused by the falling of said rod hook; that, although, Dr. Hendricks said he found no adhesions in the brain or the linings or membrances thereof, he trephined the skull and the fits ceased; that, since that time plaintiff has suffered almost constantly from hyperthesia (oversensitiveness) of the scalp and head and from high blood pressure; that the slighest physical exercise causes exhaustion and severe pains in the head and possibly other parts of the body, with a rapid and high rate of increase of the pulse and heart action; that even combing his hair causes great pain and irritation; that purgatives and aspirin have little effect on him; that he is able to sleep but little; and, finally that he had lost in weight at least twenty-two pounds since the first trial in the District Court and up to the time of the second trial on April 1, 1924.

Plaintiff testified, and in that testimony was not contradicted, that he had never had any trouble in his life before the accident. There is nothing shown of his family history that might suggest a cause for the attacks of epilepsy which he suffered following the accident. Plaintiff's counsel during the first trial had the following statement placed in the record.

"The plaintiff in this case is willing at any time that the defendant be permitted to show the family history of this plaintiff and to contradict the testimony which they submitted as to there being any prior epilepsy in any ancestor of the plaintiff."

No effort or attempt was made by defendant to offer any testimony to show that there was anything in the family history of plaintiff that might account for the epileptic fits which he said he suffered from after the accident.

It has been contended that plaintiff's testimony to the effect that he had the fits and would become unconscious and foam at the mouth was and is uncorroborated by other witnesses. It is true no witnesses came into court who swore that they had seen him have such fits; but his testimony on that score is not only reasonable but uncontradicted by any one. Counsel for defendant did not see fit to ever cross-examine plaintiff on that part of his testimony. By their failure to exercise their right to cross-examine the plaintiff on so vital a point is almost, if not fully, tantamount to an admission that that portion of his testimony is true, particularly in view of the further evidence that it offered no other evidence to contradict that part of plaintiff's damaging testimony.

Pretermitting, however, the foregoing reasons for accepting plaintiff's testimony in reference to his physical condition, this significant fact stands out, as it were, in bold relief. Plaintiff said he suffered from the epileptic fits and the defendant accepted his statement to the extent that

it sent him to the sanitarium and Dr. Hendricks, for treatment or an operation. Dr. Hendricks, after listening to plaintiff's history of his alleged condition, examined him and, not being fully satisfied as to plaintiff's condition, told him to go away and if the fits recurred to return and he would operate on his head.      Plaintiff obeyed the doctor's instructions and in a few weeks returned and told Dr. Hendricks the fits had recurred. That able and eminent surgeon found that it was necessary to operate on plaintiff's head in order to endeavor to relieve the possible pressure on the brain or reduce any adhesions that may have formed on the linings of the brain. He did perform the operation and said he found no adhesions and that the operation was a success. Now, it is absurd to think that plaintiff, if he was feinging his condition or practicing a fraud on defendant, would, for the sake of a small compensation or the mere hope thereof, willingly submit to as serious an operation as removing a portion of his skull, and permit the delving into as delicate and vital part of his anatomy as the brain. The most compensation he would hope to get would amount to much less than one-half the amount he was earning before the accident occurred.

Again, as able a surgeon and expert as Dr. Hendricks, it occurs to us, would not have subjected the plaintiff to as serious an operation as he did and thus have jeopardized plaintiff's health, if not his life, unless he had found reasonable cause for such operation. We assume the doctor used the best known and latest methods of ascertaining plaintiff's condition before he performed the operation; and we also assume that, after making use of the best known and most modernly accepted methods of dianosing plaintiff's trouble, Dr. Hendricks, exercised his best judgment and

employed his scientific knowledge in determining that an operation on plaintiff's head was necessary to relieve the diseased condition or to remove the apparent cause of plaintiff's trouble. Certainly, plaintiff, who was doubtless suffering, at intervals, from the fits, relied on the superior knowledge and skill of Dr. Hendricks, and submitted willingly to the operation. No one but an insane person or an imbecile would submit willingly to such a serious operation as did plaintiff unless he were suffering some serious ailment.

Furthermore, plaintiff's statement of his condition is strengthened by the fact that Dr. Hendricks testified that his operation was a success, and by the further fact that plaintiff says the fits ceased after the operation.

The testimony of Dr. Willis, who was appointed as a disinterested expert to examine plaintiff and report on his condition during the first trial in the District Court, as well as that of Dr. Cassity, fully accounts for the fact that plaintiff's condition was the result of the said accident. Of course, there are perhaps other causes of for instance, the high blood pressure of plaintiff; but no such other causes are shown to exist in plaintiff's case. Certainly it would seem that some of the expert physicians who examined plaintiff at different times could have found present some other conditions or cause of the high blood pressure of plaintiff than the injury he sustained and the consequent operation performed by Dr. Hendricks on plaintiff's skull if such other condition or cause existed. As said by the judge of the District Court, we can find no other reasonable cause of the high blood pressure and other trouble from which plaintiff suffers except the accident which befell him. That is such satisfaction of the judicial mind by a pre-

ponderance of the evidence that plaintiff's condition was and is the result of the accident as to warrant judgment in his behalf.

Dr. Herold, who was also appointed by the court during the last trial to examine plaintiff and report his findings to the District Judge, in his report to the judge, among other things said:

"Examination reveals a man of fairly healthy appearance, with a scar on right side of certex of skull; he complains of tenderness there, as well as general soreness over scalp. While the scar can be recognized, there is no pulsation in it, such as we find when part of the bone is absent. I find him generally, in good physical condition, except for slight enlargement of heart with increased blood pressure—156/100 at my examination; his urine was normal. The reflexes on the two sides are symmetrical, indicating lack of pressure on the brain over motor areas. I talked with Dr. Hendrick, relative to the case and Dr. Hendrick confirms the history about as above. He informed me that he did a 'bone-graft' in the skull in this case, so as to obviate the danger of the brain covering becoming adherent to the skin tissues, with a recurrence of the epilepsy."

The normal blood pressure of one of the age of plaintiff is shown to be 120 systolic and 90 diastolic. Dr. Herold says also in his report that: "On the other hand, I find no specific cause, otherwise (than the accident and operation, we take it) for the increase in blood pressure (which, altho not alarming, is considerably above the average normal for one of his age) unless it be due to the slight hypertrophy of the heart, which is fairly common in one who has done a large amount of manual labor." Now when plaintiff was examined by Dr. Cassity, nearly two years before the examination by Dr. Herold, the former found, so he testified, that:

Q. Have you had an opportunity to examine the plaintiff in this case, Mr. Maleby?

A. I did yesterday.

Q. Please state the result of your examination.

A. This man gave me a history of having been injured on June 10th, 1921, by being struck on the top of the head by a fourteen-pound rod hook. Among other things he says that it knocked two of his front teeth out, the impact of the upper against the lower teeth; knocked unconscious for a short time, and that some few months, afterwards, did not know just how many after the injury, he began having epileptic fits, that he had about eleven fits, up to the time that he applied to Dr. Hendricks of the Highland Sanitarium for treatment, which he said was March 16th, 1922, when they operated on his skull, with the object in view of trying to relieve the epileptic fits, and he says this operation, in so far as the fits were concerned, has apparently been successful, as he has not had any fits since that time.

On examination, I find that there is a small area, about an inch in diameter, on the apex of the skull.

Q. Center of the head?

A. Yes, sir, where there is absence of bone, I judge due to trephining operation, removing the bottom of bone with the purpose in view of relieving intra tranial pressure. There is considerable tenderness all over the flat that was turned down during the operation, which extends to the center of the head, then runs downward, making a flap.

Q. From the center of the head down towards the ear?

A. Yes, sir. I find a tenderness over the area. With gentle exercise of the young man, I find his pulse rate, sitting down, 108, and after exercising him, by having him to hop across the floor five or six times, his pulse rate went to 168 per minute.

Q. One minute?

A. Yes, sir. His blood pressure systolic 158, diastolic 80. Examination of the

urine showed normal urine. I find that his wind is rather bad, that is to say, gives out readily on exercise. Now there are two striking features about his condition, which I tried to explain on grounds other than his injury. That is to say, tried to rule out everything else but the injury as the cause of this abnormally rapid heart, and the resultant high blood pressure. The heart rate, of a man of his age, should be along about 72 per minute.

Q. Seventy-two per minute?

A. Yes, sir, while his was 108 sitting down, and on exercise it jumped up to 168, that was not only relatively fast in relation to the sitting down pulse, but absolutely fast, for his age. In other words, showed that the heart was evidently very much disturbed, and the exercise disturbed it and made it more rapid in proportion than when sitting, looked as if the heart center of the brain is involved and disturbed. Now, as to the high blood pressure, it is necessary to take into consideration quite a number of causes for high blood pressure. So I proceeded to look for all of the other causes that I could find, for instance, I went over his body thoroughly, and tried to find evidence of syphillis, one of the causes of high blood pressure. I included in the general history he had no history of syphilis and I found no evidence of syphilis, no evidence of chanker, or scar anywhere, so I concluded that the evidence of syphilis was negative. I found no cause other than the head injury that could cause, or seemed to be the cause, for the high blood pressure. We know that head injuries often times do cause extremely high blood pressure and a rapid heart.

It will be noted that Dr. Cassity said it "looked as if the heart center of the brain is involved and disturbed." The fact that almost two years after Dr. Cassity made his examination of plaintiff and said it "looked as if the heart center of the brain is involved and disturbed," Dr. Herold's examination of plaintiff disclosed a hypertrophied condition of the heart, which was not disclosed in any of the previous examinations made of plaintiff before and during the first trial in the District Court. All the experts agree that a blow or lick on the head may result in epilepsy, and also will cause high blood pressure, particularly if the heart center of the brain is injured, except Dr. Hendricks, who says it will cause slow pulse and low blood pressure. Dr. Willis, however, says it will cause either low or high blood pressure, depending on the portion of the brain that is injured.

Dr. Willis was again asked by the court during the last trial to examine plaintiff and report his condition to the court, which he did. He said in full:

Q. Dr. Willis, you are Dr. J. S. Willis, Sr.?

A. Yes, sir.

Q. You are the same Dr. Willis that examined Mr. Maleby the last time?

A. Yes, sir.

Q. Doctor, have you examined Mr. Maleby in the last few days?

A. Yes, sir; saw him yesterday.

Q. I will ask you what you find his condition now?

A. Practically about the same as the last examination; we made a written report and sent it to you.

Q. Do you remember the contents of the report?

A. Dr. Kerlin said that it had been sent, and if not he will bring it here.

Q. You found the blood pressure what?

A. The blood pressure, systolic, one hundred and eighty.

Q. What ought it to be in a man of his age?

A. What is his age?

Q. Twenty-six.

A. Ought to be one hundred and twenty.

Q. One hundred and twenty?

A. Yes, sir. As I recollect it, diastolic one hundred and fifteen, and it ought to be about ninety.

Q. Now doctor, the last time that you examined this man, it was one hundred and fifty-five systolic and one hundred to one hundred and five diastolic, does that indicate an improved condition, or worse?

A. According to our examination yesterday, it is worse.

Q. Assuming that this man has been trying to work, and has lost twenty to twenty-five pounds, worked off and on, something as a light job, and sometimes a job that required more or less exertion, what would you say would be the future result of a continuation of the work?

A. He is not in any condition to do hard work now.

Dr. Willis found plaintiff's blood pressure, systolic, 180, when it should be 120, and diastolic pressure 120 when it should be about 90. That disclosure shows a rather alarming condition, which causes Dr. Willis to say: "He (plaintiff) is not in any condition to do hard work now." That is about the only sort of work plaintiff is fitted to do, having little or no education, only having gone through about the third grade in school.

Truly, therefore, we can ascribe plaintiff's condition to no other cause than the accident and the consequent operation on his head. His condition is evidently the proximate result of the accident, while in the employ of the defendant. We should construe the law as liberally as we reasonably can so as to effectual its beneficient purposes. Dyer vs. Rapides Lbr. Co., 154 La. 1091, 98 South. 677; Delaney vs. Fred Brenner Lbr. Co., 154 La. 156, 97 South 349; Ferguson vs. Cady-McFarland Gravel Co., 156 La. 871; 101 So. Rep. 248, advance sheet of Sept. 27, 1924.

As said by the able and learned Judge of the District Court, and as we say now, plaintiff's condition since he developed epilepsy on or shortly before January 1, 1922,

has been such as to render him unable to perform work of a reasonable character. True, he has performed services at intervals since he developed the epileptic fits; but we think, as does the District Judge, that every day he works it shortens his life beyond proportion. Considering the humane and beneficient purposes of the Workmen's Compensation statutes, we do not think that it was the intention of the act to compel injured employees to work out of dire necessity and in order merely to maintain a subsistence for himself and those dependent upon him for support, when to work greatly accelerates and augments his debility and hastens his inevitable demise. From the testimony it is apparent that plaintiff should not work unless and until his condition shall have greatly improved. Plaintiff, therefore, is entitled to receive compensation as a total disability dating from the time he developed epilepsy at the latest on January 1, 1922, and continuing for and during a period of such total disability not longer, however, than four hundred weeks. Under the law, either party may come into court and ask for a modification of the judgment after one year from the date it becomes operative. Before and after January 1, 1922, defendant paid plaintiff compensation as for temporary total disability for a period of twelve weeks at the rate of $18.00 a week, for these amounts, credit should be given defendant. While a portion of that compensation was paid before January 1, 1922, it does not appear how much, and we shall allow defendant credit for the full amount thus paid by it.

For the reasons assigned, it is ordered, adjudged and decreed that our former judgment and decree herein be avoided, reversed and set aside, and that there now be judgment in favor of plaintiff and against defendant, condemning said defendant to pay compensation to plaintiff at the rate

of $18.00 per week, for and during a period of his disability not to exceed 400 weeks, dating from January 1, 1922, and bearing interest at the rate of five per cent per annum on each weekly payment from the date of its maturity less a credit of $216.00, paid by defendant to plaintiff say, January 1, 1922, and condemning defendant further to pay all costs of both courts.

(Porter, Judge, concurs in the decree.)

(Odom, Judge, takes no part, not having been a member of the Circuit when this case was submitted.)